IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DAVID M. WATSON,

    Plaintiff,

v.

GUS CHRISTO, et al.,

    Defendants.

No. 16-cv-433-RGA

---

DAVID M. WATSON,

    Plaintiff,

v.

JOSEPH SIMMONS and CHRISTOPHER SENATO,

    Defendants.

No. 17-cv-351-RGA

## MEMORANDUM OPINION

Denise S. Kraft, Brian A. Biggs, Kaitlin M. Edelman, DLA PIPER LLP (US), Wilmington, DE.

    Attorneys for Plaintiff.

Joseph C. Handlon, Stuart B. Drowos, Deputy Attorneys General, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, DE.

    Attorneys for Defendants.

March 25, 2019


**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court is Defendants' motion for summary judgment. (D.I. 62).[1] I have reviewed the parties' briefing. (D.I. 63, 67, 74).

## I. BACKGROUND

Plaintiff is, and was at all relevant times, an inmate at James T. Vaughn Correctional Center ("VCC"), a Delaware prison. (D.I. 31 ¶ 2).

Plaintiff filed a first *pro se* action on June 13, 2016, under 42 U.S.C. § 1983. Plaintiff named the following VCC Defendants: Chaplain Gus Christo, Grievance Chairperson Katrina Burley, former Food Service Supervisor Joseph Simmons, former Food Service Administrator Michael Knight, Major John Brennan, Warden David Pierce, and Deputy Warden James Scarborough. Plaintiff alleged violations of his civil rights for being denied access to tefillin, a religious object, and for being temporarily denied a kosher diet. (D.I. 3).

Plaintiff filed a second *pro se* action on March 31, 2017, also under 42 U.S.C. § 1983. Plaintiff alleged that, in response to his first suit, Simmons and current VCC Food Services Director Christopher Senato retaliated against him by reducing the variety of kosher meals at VCC. (C.A. No. 17-351-RGA, D.I. 3).

The Court appointed counsel for Plaintiff in both actions. (D.I. 28).[2] The Court consolidated the cases, for pre-trial purposes, based on Plaintiff's amended complaints. (D.I. 34). Between the two actions, Plaintiff brings claims related to Defendants' (1) ongoing denial of tefillin, (2) denial of a kosher diet for approximately ten weeks, and (3) retaliation by reducing the variety of kosher meals. Specifically, Plaintiff alleges that (1) by denying him tefillin,

---

[1] Unless otherwise noted, all docket citations refer to C.A. No. 16-433-RGA.
[2] Plaintiff's first appointed counsel successfully withdrew. (D.I. 23, 27).

Defendants Christo, Burley, Pierce, Brennan, and Scarborough are violating his rights under the First Amendment of the U.S. Constitution, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.* (D.I. 31 ¶¶ 32–37, 46–52), (2) by having denied him a kosher diet for ten weeks, Defendants Christo, Simmons, and Knight violated his rights under the First and Eighth Amendments of the U.S. Constitution (*id.* ¶¶ 38–45), and (3), by reducing the variety of kosher meals in retaliation for his first suit, Defendants Simmons and Senato violated his rights under the First Amendment of the U.S. Constitution (C.A. No. 17-351-RGA, D.I. 20 ¶¶ 32–40).[3, 4]

Fact discovery ended November 15, 2018. (D.I. 57). All parties except Knight were deposed. Plaintiff has also deposed current Food Services Administrator Wendal Lundy. (D.I. 63 at 2). The pretrial conference is scheduled for April 11, 2019. Jury trial is set to begin May 6, 2019. (D.I. 37, 72).

## II. LEGAL STANDARD

---

[3] Plaintiff asserts his First and Eighth Amendment claims as applicable to Delaware through the Fourteenth Amendment. (D.I. 31; C.A. No. 17-351-RGA, D.I. 20).

[4] In his second action, Plaintiff also claims that Defendants Simmons and Senato have violated RLUIPA and the First and Eighth Amendments by denying him "an adequate kosher diet." (C.A. No. 17-351-RGA, D.I. 20 ¶¶ 41–47). Plaintiff does not specify whether his claims are based on the initial ten-week denial or the later reduction in variety of kosher meals.
Claims under RLUIPA are limited to injunctive relief. *Sossamon v. Texas*, 563 U.S. 277, 287–88 (2011). It is undisputed that Plaintiff is currently receiving a kosher diet. (D.I. 67 at 14 n.2 ("Mr. Watson does not seek RLUIPA relief in C.A. No. 16-433 related to Defendant's improper denial of his kosher diet request. He is currently receiving a kosher diet, so injunctive relief under RLUIPA would be inappropriate.")). It is also undisputed that the number of kosher meals, while previously reduced to six from ten to twelve, has now been increased back to ten to twelve. (D.I. 67 at 2; D.I. 64, A-63 at 14:6–8, A-70 at 41:14–19). Therefore, Plaintiff has no RLUIPA claim related to his kosher diet.
Any First and Eighth Amendment claims based on the initial ten-week denial are duplicative of the claims in Plaintiff's first action. (*See* D.I. 31 ¶¶ 38–45). That leaves the First and Eighth Amendment claims based on the reduction in variety of kosher meals. The parties only address the reduction in variety as part of Plaintiff's retaliation claim. (D.I. 63 at 1, 19; D.I. 67 at 2, 17–18). I doubt that a reduction in variety is, by itself, an unconstitutional denial of "an adequate kosher diet." *See Tapp v. Proto*, 404 F. App'x 563, 566 (3d Cir. 2010) (finding no constitutional violation for kosher meals that "lacked variety and were often cold"). However, the parties have not briefed the issue. Therefore, the parties shall confer and **SUBMIT A JOINT PROPOSAL** on how to address the issue moving forward.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 461.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect

to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III. ANALYSIS

### A. Denial of Tefillin

Tefillin is a religious item normally worn by adult Jewish males during their weekday morning prayers. A pair of tefillin consists of two small leather boxes containing parchment inscribed with verses from the Torah. Each box is attached to thick leather straps several feet in length. The straps are used to bind the boxes to the head and arm during prayer. (D.I. 68, Ex. 3 ¶¶ 11–14; D.I. 23, Ex. A; *see also* D.I. 63 at 7–8).

Defendants have twice denied Plaintiff's request for tefillin. Plaintiff made his first request on April 9, 2016, in a letter to Chaplain Christo. (D.I. 64, A-98, A-7 at 32:3–6). Warden Pierce and Deputy Warden Scarborough discussed Plaintiff's request in a senior staff meeting.[5] The request was rejected for security reasons. (*Id.*, A-109 at 8:8–9:23, A-238). According to Pierce, they were concerned that the tefillin's long leather straps could be misused, including "to tie up someone, either another inmate or staff member," "to secure a door or a fence," "for self-harm attempts," "to affix another weapon to one's body," or "to defeat razor wire in an escape attempt." (*Id.*, A-110 at 10:21–12:6). Further, Plaintiff was housed in the maximum-security Residential Treatment Unit ("RTU"). (*Id.*, A-112 at 11:15–12:23, A-98, A-7 at 32:7–21). The RTU is designated for mentally ill inmates requiring inpatient treatment. Inmates in the RTU are at a higher risk for misconduct than other inmates, including those in maximum security. (*Id.*, A-

---

[5] Major Brennan may have also been in the meeting. (D.I. 64, A-105 at 44:7–17, A-110 at 9:24–10:3).

5

113 at 13:13–19). Plaintiff is in the RTU to receive treatment for schizophrenia and bipolar disorder. (*Id.*, A-2 at 6:6–21).

Plaintiff filed a grievance on May 9, 2016, after his initial request was denied. The grievance was handled by Grievance Chairperson Burley. (*Id.*, A-239, A-240).[6]

In 2018, Defendants Scarborough and Brennan revisited Plaintiff's tefillin request in a meeting with current Warden Metzger. (*Id.*, A-100 at 18:16–20:2, A-112 at 9:18–11:6). The request was denied because Plaintiff was still housed in the RTU and had recently escaped. (*Id.*, A-101 at 21:7–22:16).[7] There was again concern about the tefillin leather straps, as well as use of the boxes as a weapon or to conceal contraband. (*Id.*, A-102 at 35:2–23). Defendants considered possible accommodations to provide Plaintiff with limited access to tefillin, but ultimately determined that the security and staffing concerns were too great. Due to its maximum-security setting and uniquely challenging population, the RTU is "a very hectic and very labor-intensive unit."[8] (*Id.*, A-103 at 31:7–32:3).

VCC, as a whole, is also significantly understaffed, averaging over 800 overtime positions (8-hour shifts) a week to meet "minimum manning" requirements. (*Id.*, A-106 at 61:16). Brennan explained that it would be unmanageable to dedicate two of his eleven RTU staff members for Plaintiff's daily use of tefillin. (*Id.*, A-103 at 30:13–31:6). According to

---

[6] Burley was new at the time and, in accordance with her understanding of the inmate handbook, testified that she likely told Plaintiff to write to Christo and resubmit the grievance if he did not respond. Now, she would forward the grievance to Christo directly. (D.I. 64, A-245 at 18:6–20).

[7] Plaintiff escaped from custody in April 2017 while being transported. He was on the run for six days before being taken back into custody. He stated that he "felt commanded by a snake to escape." (D.I. 64, A-37).

[8] Daily activities include "area checks, escorts, windows and bars, shakedowns, escorting offenders to or from programming, [and] getting them into the designated areas for one-on-one sessions with the mental health professionals." (D.I. 64, A-103 at 29:5–17). Under the Settlement Order in *CLASI v. Coupe* (C.A. No. 15-688-GMS, D.I. 40), offenders in the RTU are required to have 17.5 hours of out-of-cell recreation and 10 hours of mental health programming per week. (D.I. 64, A-101 at 21:9–18).

Plaintiff's religious beliefs, he is required to pray with tefillin each weekday morning for approximately ten to twenty minutes. (D.I. 68, Ex. 3 ¶ 16). Scarborough stated that if Plaintiff was flexible in when he used the tefillin, VCC "could probably find a time frame to make it happen," but there would be no guarantee because "things happen that cause a security alert [and] cause [the] staff to be diverted." (*Id.*, Ex. 5 at 86:24–87:13).

Finding a suitable location to store and to use the tefillin would also be difficult. The chapel, where other religious devices are stored and used under supervision, is in the lower security part of VCC and not equipped for maximum-security inmates like Plaintiff. (D.I. 64, A-104 at 33:13–34:5). The RTU has some secure rooms, but they are primarily used by mental health professionals to treat inmates in distress. (*Id.*, A-103 at 29:18–30:4). VCC would not allow the tefillin to be stored in Plaintiff's cell for concern of misuse. (*Id.*, A-103 at 29:5–17, 32:4–20).

### 1. RLUIPA

RLUIPA gives religious exercise heightened protection against government burdens. *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005). Section 3, which applies to institutionalized persons, provides:

> (a) No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . , even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1. A plaintiff must show that (1) his exercise of religion is grounded in a sincerely held religious belief, and (2) the institution's policy or official practice "substantially burdened" that exercise of religion. 42 U.S.C. § 2000cc-5(7)(A), 2(b); *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015); *Washington v. Klem*, 497 F.3d 272, 277–78 (3d Cir. 2007). The burden then

7

shifts to the institution to show that its policy or practice was (1) in furtherance of a compelling governmental interest, and (2) the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1; *Hobbs*, 135 S. Ct. at 863.

RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722. Lawmakers expected courts to act with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security[,] and discipline, consistent with consideration of costs and limited resources." *Id.* at 723 (quoting S. Rep. No. 103-111, at 10). But deference is not "unquestioning acceptance." Courts retain "the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard." *Hobbs*, 135 S. Ct. at 864.

Here, Plaintiff alleges that Defendants have substantially burdened the exercise of his sincere religious beliefs by denying him access to tefillin. It is undisputed that tefillin is required for some Jewish practices and thus denying access to tefillin is a substantial burden on those practices. (D.I. 63 at 7, 17; D.I. 68, Ex. 3 ¶¶ 11–14). The sincerity of Plaintiff's religious beliefs is a disputed question of fact. (D.I. 63 at 17).[9] Therefore, to succeed on summary judgment, Defendants must show that even if Plaintiff meets his burden, there is no genuine dispute of fact that denying Plaintiff access to tefillin is in furtherance of a compelling governmental interest and the least restrictive means of doing so.

---

[9] Plaintiff's prison records, as of April 5, 2016, describe him as Buddhist. (D.I. 64, A-36). Plaintiff states that he is Jewish by birth, he identified as Christian when he attended Salisbury Baptist Academy around 2000, and he began reidentifying as Jewish in 2006 or 2011. (*Id.*, A-3 at 8:24–9:8, A-4 at 15:15–24, A-5 at 16:2–10, A-15). Plaintiff also states that he kept kosher and used tefillin regularly between 2011 and 2013 when he was not in custody. (*Id.*, A-4 at 14:21–15:1, A-6 at 24:23–25:14). Rabbi Yair Robinson has provided an expert report opining that Plaintiff's religious beliefs are sincere. (D.I. 68, Ex. 3 ¶¶ 8–9).

The key issue is whether full denial of tefillin is the least restrictive means available to Defendants. The parties agree that prison safety and security are compelling governmental interests and that the denial of tefillin is in furtherance of those interests. (D.I. 63 at 14; D.I. 67 at 7–9). Plaintiff argues, however, that Defendants' failure to provide even limited access to tefillin cannot be the least restrictive means of satisfying safety and security. (*Id.*).

Plaintiff essentially makes three arguments. First, Plaintiff argues that tefillin is no more dangerous than other religious objects VCC inmates are allowed to possess, including metal Christian cross necklaces, rosary beads, kufis, prayer rugs, and religious medallions. Those objects are available for purchase in the VCC commissary and maximum-security inmates are allowed to possess them full-time. Thus, Plaintiff asserts, Defendants have overstated the risk of allowing Plaintiff to keep tefillin in his cell. (D.I. 67 at 9–10). Second, Plaintiff disputes the legitimacy of Defendants' staffing concerns. Plaintiff points to Deputy Warden Scarborough's statement that, under certain circumstances, they "could probably find a time frame" to make an accommodation. Plaintiff also notes that some inmates have been allowed to use tefillin in the VCC chapel. (*Id.* at 10–11). Third, Plaintiff points to policies at other prisons giving maximum-security inmates supervised access to tefillin. (*Id.* at 11–12).

Plaintiff's first argument misses the mark. The relevant inquiry is not whether tefillin is generally more dangerous than other objects inmates are allowed to possess, but whether Plaintiff can possess tefillin without compromising prison safety and security. Regardless, tefillin is undoubtedly distinct from the other objects Plaintiff identifies. Plaintiff focuses on the metal cross necklace in particular, which comprises a 2-inch cross and 2-foot chain. (D.I. 67 at 9–10; D.I. 68, Exs. 16, 17). It is immediately clear from images of the necklace that it does not pose an analogous threat—the chain is only about 1/16 inch thick. (*Id.*, Ex. 17).

9

Plaintiff's second argument also fails. Scarborough by no means admitted that his current staff could accommodate Plaintiff. He merely stated that they could provide the tefillin if Plaintiff accessed the tefillin at flexible times, rather than each weekday morning as per his religious beliefs, and if staff were not diverted for other security concerns. (D.I. 68, Ex. 5 at 86:24–87:13). Likewise, the fact that lower security inmates are able to access tefillin in the VCC chapel does not help Plaintiff.[10] The chapel is not equipped to handle maximum-security inmates such as Plaintiff. (D.I. 64, A-104 at 33:13–34:5).

Plaintiff's last argument relies on policies at other prisons. "While not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of a need for a particular type of restriction." *Hobbs*, 135 S. Ct. at 866 (quoting *Procunier v. Martinez*, 416 U.S. 396, 414 n.14 (1974)). RLUIPA does not require a prison to grant a particular religious exemption "as soon as a few other jurisdictions do so." "But when [] many prisons offer an accommodation, a prison must, at minimum, offer persuasive reasons why it believes that it must take a different course." *Id.*

Plaintiff cites two examples from other jurisdictions, described in *Searles v. Bruce*, 2003 WL 23573643 (D. Kan. Oct. 20, 2003), and *Spigelman v. Samuels*, 2015 WL 1411942 (E.D. Ky. Mar. 26, 2015). In *Searles*, a Kansas state prison initially denied inmates in segregation access to tefillin due to security concerns over the long leather straps. The prison later amended its policy to allow limited access—the tefillin was kept in a secure area and only given to the inmates during prayer. *Searles*, 2003 WL 23573643 at *3. Similarly, in *Spigelman*, a federal

---

[10] If anything, the fact that lower security inmates are able to access tefillin suggests that the prison administrators are exercising reasonable judgment based on penological concerns in denying Plaintiff similar access. This is consistent with Scarborough's testimony that he "would have been inclined to allow" Plaintiff access to tefillin if he was a lower security inmate. (D.I. 68, Ex. 5 at 11:15–12:15).

10

prison developed a protocol to give inmates in the Special Housing Unit ("SHU") limited access to tefillin. An inmate could use tefillin during his recreation period when he was under the direct supervision of the recreation officer. The inmate would submit a written request, staff would retrieve the tefillin, and after the inmate's prayers, the tefillin would be returned to the officer's station. *Spigelman*, 2015 WL 1411942 at *1.

*Searles* and *Spigelman* both fail to address the specific concerns raised here. First, the mental health aspect of the RTU makes for a substantially more challenging environment than other maximum-security units like segregation or the SHU. Not only is the RTU population at a higher risk for misconduct, but the inmates require additional recreation and special programming. (D.I. 64, A-101 at 21:9–18, A-113 at 13:13–19). Further, VCC is severely short-staffed. (*Id.*, A-103 at 30:13–31:6, A-106 at 61:16). It may not have the manpower to require staff, on a daily basis, to process requests for tefillin, retrieve the tefillin, supervise each inmate's use, and return the tefillin to a secure area.

Plaintiff does not dispute that using tefillin in secure housing "present[s] uniquely challenging safety and security risks." (D.I. 67 at 12). Plaintiff also does not dispute that the RTU is an especially challenging unit, even among maximum-security units, or that VCC is short-staffed. (*See id.* at 7–14). Plaintiff merely points to Scarborough's comment that they "could probably find a time frame" to make an accommodation under certain circumstances. As discussed, when read in context, that comment is consistent with other evidence of staffing concerns.

Moreover, it is undisputed that Plaintiff is a high-risk inmate. As noted when Defendants denied Plaintiff's second tefillin request, Plaintiff escaped from custody in 2017. (D.I. 64, A-37). His disciplinary record also shows he was found with a razor blades in 2010, and again in

11

2017, along with other sharpened bits of metal. (*Id.*, A-43, A-44). He admits that he has threatened to kill officers and medical staff. (*Id.*, A-11 at 49:4–20, A-46, A-47). He stated that he has attempted suicide twice and has told an officer he was suicidal. (*Id.* A-11 at 51:21–23, A-12 at 52:12–20, A-42).

On the present record, I find no genuine dispute of material fact that (1) Defendants are denying Plaintiff access to tefillin in furtherance of the compelling governmental interests of prison safety and security, and (2) complete denial is the least restrictive means of furthering those interests.

Therefore, Defendants' motion is **GRANTED** with respect to Plaintiff's tefillin claim under RLUIPA.

### 2. First Amendment Free Exercise Clause

The First Amendment offers substantially less protection than RLUIPA. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). As discussed, Defendants have shown that their decision to deny Plaintiff tefillin meets the rigorous strict scrutiny standard under RLUIPA. Defendants thus have also shown that their decision meets the much less demanding rational basis standard under *Turner*—denying Plaintiff tefillin is reasonably related to legitimate penological interests in prison safety and security.

Therefore, Defendants' motion is **GRANTED** with respect to Plaintiff's tefillin claim under the First Amendment.

### B. Denial of a Kosher Diet for Ten Weeks

Plaintiff requested a kosher diet on February 24, 2016 and filed a grievance two days later. (D.I. 68, Exs. 7, 8). Defendant Simmons denied Plaintiff's request. Simmons told

Plaintiff, pursuant to Defendant Knight's unwritten policy, that he had to have an outside rabbi verify he is Orthodox Jewish. (*Id.*, Ex. 9, Ex. 11 at 15:14–16:14; D.I. 64, A-51). Knight's policy was abandoned in April 2016, pursuant to a Department of Correction directive. (*Id.*, Ex. 10 at 32:17–33:9). VCC's new policy provided that instead of relying on outside verification, "if an inmate had requested any type of diet, then [VCC] would simply honor it." (*Id.*, Ex. 10 at 30:2–6). After the policy change, Senato upheld Plaintiff's grievance and Plaintiff began receiving a kosher diet on May 8, 2016. (D.I. 64, A-49, A-72 at 87:10–18). Plaintiff is now seeking damages for the ten-week period that he was denied a kosher diet. (D.I. 31 ¶¶ 38–45).

Defendants argue that Plaintiff's claim is precluded by qualified immunity. (D.I. 63 at 18).

> A defendant sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "clearly established" at the time of the challenged conduct. A right is "clearly established" for these purposes when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right. It is not enough that the right is defined at a high level of generality; rather, the dispositive question is whether the violative nature of particular conduct is clearly established.

*Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017) (internal citations, quotation marks, and brackets omitted). An inmate-plaintiff has a clearly established right to a religiously-motivated diet so long as the views underlying the diet are "(1) sincerely held, and (2) religious in nature, in [his] scheme of things." *Parkell v. Senato*, 704 F. App'x 122, 127 n.11 (3d Cir. 2017) (quoting *DeHart v. Horn*, 227 F.3d 47, 52 (3d Cir. 2000)).

*Parkell v. Senato* is informative. 224 F. Supp. 3d 388 (D. Del. 2016) (*Parkell I*), *aff'd in part, vacated in part*, 704 F. App'x 122 (3d Cir. 2000) (*Parkell II*). Parkell, also an inmate at VCC, brought a § 1983 claim for being denied a kosher diet for two years. Parkell characterized his belief system as "Jewish/Wicca." The defendants informed Parkell that in order to receive

13

kosher meals, he had to have a rabbi verify him as Orthodox Jewish. *Parkell II*, 704 F. App'x at 124. The defendants appear to have followed the same unwritten VCC policy that is at issue in this case. This Court found, for purposes of summary judgment, that the two-year delay in Parkell's receipt of kosher meals, "without any explanation for the delay (other than the April 2016 policy change)," violated his First Amendment rights. *Parkell I*, 224 F. Supp. 3d at 398–400. But, the Court granted summary judgment in favor of the defendants on the basis of qualified immunity. *Id.* at 400–01.

The Third Circuit reversed and remanded on the issue of qualified immunity, finding this Court erred by determining that a practitioner of Parkell's particular beliefs (Jewish/Wicca) did not have a clearly established right to a kosher diet. *Parkell II*, 704 F. App'x at 125–26. "That Parkell's views are novel—or unorthodox—does not matter for purposes of qualified immunity." *Id.* at 127 n.11. "[S]incerity rather than orthodoxy is the touchstone." *Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011). Thus, the proper inquiry was whether "[the defendants] reasonably attempted to determine whether [Parkell] has a sincere belief that his religion requires a [kosher] diet." *Parkell II*, 704 F. App'x at 126.

Here, it is undisputed that Plaintiff's initial request for a kosher diet was denied pending verification from an outside rabbi. Although, unlike Parkell, Plaintiff does not appear to have "novel" religious views, the qualified immunity inquiry remains the same—did Defendants reasonably attempt to determine whether Plaintiff has a sincere belief that his religion requires a kosher diet? As discussed, the sincerity of Plaintiff's belief is a disputed question of fact. *See supra* note 9 and accompanying text. Further, there is no evidence that Defendants considered the sincerity of Plaintiff's belief at all. Under Knight's now-abandoned policy, Defendants automatically denied all kosher diet requests unless there was verification from an outside rabbi.

14

Defendants cite to a Sixth Circuit decision, *Colvin v. Caruso*, 605 F.3d 282 (6th Cir. 2012), to argue that the initial denial of Plaintiff's kosher diet was a "reasonable mistake" covered by qualified immunity. (D.I. 63 at 18). In *Colvin*, the prison chaplain received the plaintiff's request for kosher meals, checked his eligibility, and was informed that he was Muslim and thus ineligible. The chaplain then erroneously denied the plaintiff a kosher diet. The court held that the chaplain, "at worst, committed a 'reasonable mistake' as to [plaintiff's] status, a mistake that does not disqualify him from receiving qualified immunity." *Id.* at 291. I do not think *Colvin* applies here. Defendants cannot claim to have made a "reasonable mistake" as to Plaintiff's religious belief—Defendants did not even inquire into Plaintiff's religious belief as they denied his request based on the strict policy of requiring validation from an outside rabbi.

Lastly, Defendants cite to *Norwood v. Strada*, 249 F. App'x 269 (3d Cir. 2007), and *Lewis v. Zon*, 920 F. Supp. 2d 379 (W.D.N.Y. 2013), which found temporary denial of religious meals a *de minimis* interference with religion and thus not a First Amendment violation. (D.I. 63 at 18). In *Norwood*, the plaintiff was denied a halal diet during an emergency lock-down lasting 2.5 days (seven meals). 249 F. App'x at 272. In *Lewis*, the plaintiff was denied kosher meals during transfers between facilities. 920 F. Supp. 2d at 386. Here, Plaintiff was denied a kosher diet from February 24 to May 8, 2016, a continuous ten-week period. That is far beyond what courts have considered *de minimis* intrusions on religion. *See, e.g.*, *Tapp v. Proto*, 404 F. App'x 563, 566 (3d Cir. 2010) (finding "intermittent problems with food preparation," such as lack of variety and being cold, impose only a *de minimis* burden on the inmate's religion); *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (unavailability of pork-free meals on 3 of 810 occasions was a *de minimis* burden on the inmate's religion).

Therefore, Defendants' motion is **DENIED** with respect to Plaintiff's kosher diet claims.

## C. Retaliation by Reducing the Variety of Kosher Meals

A plaintiff bringing a retaliation claim must prove that (1) his conduct was constitutionally protected, (2) he suffered an adverse action at the hands of prison officials, and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take the adverse action. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citing *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001)). Causation can be shown with evidence of either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Id.* at 422 & n.8 (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2003)). If the plaintiff meets his burden, the defendant will still prevail if it proves "by a preponderance of the evidence that it would have taken the same [adverse] action even in the absence of the protected activity." *Rauser*, 241 F.3d at 333.

Here, Plaintiff alleges that (1) he exercised his constitutionally protected rights by filing his first suit, (2) he suffered adverse action at the hands of prison officials when VCC reduced its variety of kosher meals, and (3) his first suit was a substantial or motivating factor in VCC's decision to reduce its variety of kosher meals. Plaintiff's retaliation claim is limited to Defendants Simmons and Senato. (C.A. No. 17-351-RGA, D.I. 20 ¶¶ 32–40).

Plaintiff filed his first suit on June 13, 2016. (D.I. 3). Sometime in 2016, VCC reduced the number of kosher meals to six from ten to twelve.[11] Neither party has identified a specific date in 2016 when Defendants decided to reduce the number of meals. Senato stated that the decision was probably made in mid-2016. (D.I. 64, A-64 at 17:11–13). Lundy, Senato's

---

[11] Plaintiff first alleged that the number of meals was reduced from twenty to six. (C.A. No. 17-351-RGA, D.I. 20 ¶ 34). Plaintiff now appears to agree that the initial number was approximately ten to twelve. (D.I. 67 at 17–18).

16

supervisor, stated that the decision was made in either March or October 2016, when he planned the menu for the upcoming meal cycle. (*Id.*, A-74 at 22:20–24:11).

Defendants argue that Plaintiff has failed to show a causal link between his first suit and the reduction in variety of kosher meals. (D.I. 63 at 19). Plaintiff relies solely on the temporal proximity between the two events. (D.I. 67 at 17–18). A temporal proximity of two days is unusually suggestive of causation, but a temporal proximity greater than ten days requires supplemental evidence of retaliatory motive. *See Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014) (citing precedential authority). Here, Plaintiff has not even established when the decision to reduce the meals was made. The record indicates that the decision was either made in March, "mid-," or October 2016. (D.I. 64, A-64 at 17:11–13, A-74 at 22:20–24:11). Even assuming the decision occurred sometime after Plaintiff filed suit—"mid-" or October 2016—I do not think Plaintiff can meet his burden. If a proximity of ten days requires additional evidence of retaliatory motive, an undefined proximity over a period of several months cannot possibly be sufficient, by itself, to show causation. Therefore, Plaintiff's retaliation claim fails as a matter of law.

In the alternative, assuming Plaintiff can make a *prima facie* case, the claim still fails because Defendants have met their burden on rebuttal. Specifically, Defendants have shown that their decision to reduce the meals was based on reasons unrelated to Plaintiff filing suit.

First, on June 22, 2016, another VCC inmate filed a grievance complaining that some of the kosher meals had insufficient calories. (D.I. 64, A-80). Defendants did an analysis and found that certain meals were below the target range of 400 to 500 calories per entrée. (*Id.*, A-63 at 14:6–15:4). All the meals below 400 calories were removed, with the exception of a 390-calorie chicken dish that was kept as the only non-beef option. (*Id.*, A-64 at 18:20–19:9, A-69 at

17

39:24–40:15, A-92). Defendants have produced the nutritional labels for all the kosher meals offered at VCC over the past several years. (D.I. 64, A-91). Plaintiff does not dispute that the meals removed in 2016 were below the 400-calorie target. (D.I. 67 at 6, 17–18).

Second, the kosher meal program grew dramatically in 2016. The same low-calorie meals had been offered for prior meal cycles, but very few inmates were receiving kosher diets at that time. (*Id.* at 18; D.I. 64, A-74 at 24:22–24, A-75 at 27:9–28:7, A-71 at 77:4–15). According to Senato's unrebutted testimony, about four inmates had kosher diets in February 2016. A couple months later, it was about fifteen inmates. By the time the low-calorie meals were cut, there were about eighty inmates receiving kosher diets. (D.I. 64, A-71 at 77:4–78:6). The increase was likely due to VCC's new policy that gave a kosher diet to any inmate who requested one. (*Id.*, A-71 at 78:11–15; D.I. 68, Ex. 10 at 30:2–6, 32:17–33:9)

The above facts are not genuinely disputed. They prove that Defendants reduced the number of kosher meals for non-retaliatory reasons—the low-calorie content of certain meals and the dramatic increase of inmates receiving a kosher diet—and would have done so regardless of whether Plaintiff filed suit. Thus, should Plaintiff be determined to meet his burden on causation, Defendants would nevertheless succeed on rebuttal.

Therefore, Defendants' motion is **GRANTED** with respect to Plaintiff's retaliation claim.

IV. **CONCLUSION**

A separate order will be entered.